Your Honor, it's the second case of the morning called 214-0178, Wendell Hyatt v. Illinois Tool Works, Inc. On behalf of the appellant, Mr. Kevin DeBruce, on behalf of the athlete, Mrs. Karen DeGranate. Thank you. Mr. Bruce, you may proceed. Thank you, Justice. Good morning. May it please the Court, Counsel. We're here today on a motion for summary judgment as granted by the trial court. The crux of the issue is, do we as the plaintiffs have facts? Do we have facts in light of the evidence that I presented at the trial court to constitute the various elements of a joint venture? I suggest that we do. I suggest the trial court here enforces this as a de novo review. Going back over these briefs in the days leading up to this, and reading the defense counsel, I think there's some important points that I want to set on the table at the very outset. The trial court, and I would say mistakenly, seemed to accept this notion that this was a simple vendor-purchaser agreement. That it was just like any old thing where McDonald's buys this styrofoam cup and they buy it and it's just a buyer-seller agreement. That's all this is. And if you accept that theory, if you accept that fact pattern, I don't disagree with what the trial court did. I don't. But that's not what we have here. And I have overwhelming evidence to the contrary. How is it different? Certainly, Justice, and I'm glad you asked that. I took every single deposition in this case. I deposed a number of the management level employees of both Western Plastics and ITW. And to a person, to a witness, and I cited it extensively in my brief, every single one of them, when I started on this road, agreed this was like no other. This agreement was like no other. And I'm going to answer your question with specifics, but I just want you to know it's not me representing that this is a different, distinct, and unique arrangement between these parties. That's their own words to me. That's what Western Plastics told me. That's what ITW told me. Now, why is it different? Let's just start down the litany of lists, right? So, first of all, unlike no other, ITW, this big company, they go and they set up shop right next to Western Plastics. They go out here to Addison, Illinois, and they set up shop right next to them so that they're sharing the same building. They go in and out of the back door. Now, and again, I want to be clear. How do they share profits and losses? Well, I was going to get to your point with respect to why is it different. Okay, well, there's some key issues here that I know we have limited time. I apologize for interrupting your description, and I'm sure you can get back to it, but that's one of the questions. Certainly, I want to talk about profits and losses, obviously. But why is it different? Because they park next door. The people are in and out from ITW telling Western Plastics employees what to do. There's a conflict in the evidence on whether or not they're monitoring equipment. They go, like no other arrangement at all, they go and put electronic monitoring equipment in Western Plastics' facility. They're going in there and telling those employees what to do. They're paying for the rollers that my client lost both of his arms on, and it goes on and on and on. They're sharing costs. Okay, but how does that impact profits and losses? Absolutely, and if you look at every one of these cases that we're both citing to you in terms of losses and profits, let's talk about that. Whether it's this court's opinion on the lottery ticket, what's the loss in that? What did this court in the second district say what's the loss? What's the answer to that question? The answer to that question is simply this, it's the cost of the ticket. That's what this court said. So you look at the case, the Thompson v. Heitman case, where the lawyer and the lawyer left the firm and all of that, and then the court analyzed it and said what's the loss in that case? The loss in that case was the expense that the firm put forth, the cost that the expense of the firm put forth for those cases. And it goes on and on. So I'm trying to look at it in a simplistic, academically honest fashion. What's the cost? So in this case, the costs are complete. I mean, they're both within the written agreement and outside. And I think if there's one point that I want to make to you before I sit down is their whole theory of this case, and they have to go this way because they know the extraneous evidence of all the letters that talk about this being an extension. We have in the record, and I cited it just so we're clear about single enterprise for profit, in their own words, ITW's own words, this enabled ITW to function with Western Plastics as a true extension of our business, a true extension of our business. If that's not a single enterprise for profit, and that's before lawyers and lawsuits, that's the letter that they wrote, that's volume 19-04663. So the point that I'm making with respect to profits and losses is the written agreement has pallets. We're going to share 10% and 90%. We're going to pay for the rollers. You pay for the maintenance of the rollers. If you guys go overtime and your employees have to work more, we're going to pay your employees. What other vendor agreement do they have to do that? Every time I got to these 100 points in the deposition, I would say, now, do you do that with any other agreement? Do you guys go and park next door and then have your people go in there and tell your other vendors, employees what to do? And before Mrs. DeGrande stands up, I know there's conflicts in the evidence, but we're here on summary judgment. Some people said, no, we never told them what to do. They interviewed her. We're going to pay the company. We didn't tell them. I had other evidence from the guys that actually did the work, said, yes, they came next door. Would you agree that all the things you're talking about in the cards you have there that you have the testimony on is really irrelevant if the contract itself is clear and unambiguous? Justice Berg, thank you. Please, thank you for asking that question. You're welcome. Okay. So let's start with Mrs. DeGrande's case, Quadro. They like Quadro. They're talking all about Quadro. If you'll indulge me, in short, this is Quadro, their case, and I have many cases that we've cited that stand for this proposition, and the proposition is this. You don't simply look at the agreement. You look beyond the agreement. And so you say, Devin, where do you get that? Quadro, in short, the existence of an express agreement is just one of several factors courts consider in determining whether a joint venture exists. That's her case, not mine. That's her case, not mine, and it continues. In my case, which I'm citing, Abdul versus Swanson, the fact, I'm sorry, Abdul's versus, as a result, we do not find that the terms of the agreement are dispositive of whether a joint venture exists to the exclusion of the oral terms agreed to by the parties. Would you agree that Public Electric really just looked at the terms of the contract? In that case, they actually agreed to share profits and losses, explicitly agreed to, but the court looked at that language in that contract and said that there was no joint venture. Justice, what I'm saying to you is, and Public Electric, I like Public Electric for this reason, the determination of whether a joint venture exists depends upon the nature and substance of the enterprise and not exclusively upon the form of the agreement, and then the court continues. But the point that Public Electric is making and their decision and Quadro is making and the Abdul decision is making and even in the Thompson versus Heitman where there were agreements about the contractual relationship with the clients, all of these cases stand for one proposition, I suggest to you, and your decision in Maher, which I also cited to this court. They want to get into the weeds on you just look at the four corners. I suggest to you there's a number of reasons you don't. A, the interpretation of these clauses can be interpreted in different ways. In Maher, you say that's not the matter of summary judgment. That's Second District, right? Well, there's not a grand summary judgment on these four corners of the contract. This court reversed and remanded and said no. Multiple interpretations and also, and I think this is important, this contract was 1993. My client was injured 14 years later. In the testimony, there's no question that the terms and conditions of this contract over the time changed. And when you look at what you told me to do in Maher and what you told the others to do in Maher is, when you have acts in conduct beyond that change the nature of the relationship according to Maher, then you take in this extraneous evidence. So there's a number of reasons. A, I'm saying that it's ambiguous, various portions of this contract that they're relying upon. B, I'm relying upon this joint venture case law which says, yes, you do look at the written agreement, but then you look at beyond the written agreement. Three, I'm looking at beyond the acts and conduct of the parties after the written agreement is compiled. That's the Maher opinion that I cited to this court. And it goes on. So, yes, Justice, I agree with you. You look at the agreement. But the agreement here doesn't say what they want it to say, unfortunately, for them, number one. Number two is I'm saying to you that I'm taking this warm testimony of ITW and Western Classics about how they conducted themselves, which I would suggest is in conflict with what they really want to hang their hat on, which is this independent contractor thing. Could Western profit from the sale of this product to anyone else? Western Plastics? Sure, it's proprietary. ITW, they bought it. That's what they said. No, I'm saying anyone besides ITW. They could only sell this to ITW. They manufactured it, but could only sell it to them. So their profits were actually tied only to ITW, correct? Absolutely. I think that helps me. I think that helps me. I'm not saying it doesn't. No, you're right. Yeah, and I make that in the brief. I think it's good for us. So, in any event. Well, the fact that two entities are making profits and they're tied together in the making of those profits, I mean, that's every business relationship in the world. Yeah. If you're looking at some of the cases, you know, that I've looked at from out of state, you know, this case from the Utah Supreme Court, it says an agreement to share profits is indispensable to a joint venture, and profits accruing must be joint and not several. So please tell me where there was an agreement here that at the end of the day they would share profits. Well, I can only go by two main points, which is the testimony, which I've cited in the briefs, where in a broad context the ITW and the Western Plastics say we entered into this agreement to make profits, okay? Justice, I'm not going to misrepresent. Do I have we share profits? I don't have that from their controlled employees who are testifying on cross-examination. I have letters and I have testimony, which I've cited in my brief, which talks about we entered into this arrangement, which I'm saying is wildly unique to any other vendor agreement. If one of these entities at the end of the day, at the end of a year of producing and buying and selling and all this, checking the thickness and all that, at the end of the year, if one of these entities on this specific product made on that specific machine made profits and the other entity took a loss, they would not reconcile that. The one would take the loss, the one would take the profit. Paragraph 15 of the agreement, which they're running away from, that costs improvements. First of all, I mean, I think there's evidence in the record, at least I thought I saw, that that provision was never actually brought to bear. Well, respectfully, no, wait, now, Justice, they can't pick and choose. Now, wait a minute, I mean, you know, let's be fair to my client. Okay, the agreement's in there. Okay. I mean, share in cost improvements that they make. And the benefits by percentages that are specific to them. Right. Cost improvement points. You've raised two important points, and they're good points. I was thinking about this at the Greasy Spoon last night. Right? So there's this whole discussion that they want to bring up, these out-of-court cases, which is Devin's only saying mutual benefit, and if that's all he's got, then he loses. I'm not saying that's all I've got. I'm saying beyond that, number one. And I answered your question. I put the testimony that I have in the letters about mutually making profits. I don't have it saying share, but I've got mutual. And this is summary judgment stage. I want reasonable insurance. I get to argue this to a jury is what I'm trying to say. I get to argue this to a jury. But more importantly, in their public electric case, if I'm not mistaken, that went to a trial. I mean, so, I mean, we're here on summary judgment. And do I have any facts? No. But to get to the cost improvement of what Justice Zeno said, look, I'm saying, and I'm following your Maher decision because I want to have reasonable inferences, but the only reasonable interpretation of this, I mean, the trial court, Justice Sousa-Sponte, as a matter of law, that cannot be talking about profits. If you read it, it only talks about it. Western and ITW agreed to share. There's that magic word that you want me to show you where it is in the record. I got it. I got it in their agreement. I mean, they can't run away from this language that they wrote. Western and ITW agreed to share the benefits of cost improvements, and then they go further. They go further. 50% to Western, 50% to ITW if it's an issue. What other benefits are they talking about? Now, we're here on summary judgment. I get to argue to a jury they're talking about. The only logical conclusion is they're talking about profits. The benefit is profit. I mean, I don't know how else you can read that. Well, I mean, the contract. Let's say ITW orders 100,000 of these sheets in a year, and for some reason the market dries up. They'd still have to pay for the production of those sheets to Western Plastics for the contract. Yeah, but if they make cost improvements. No, no, I'm talking about. Well, now we're talking about losses. Yeah. Okay, so let's talk about the losses, right? So the pallets are worn in part by ITW. The maintenance of the rollers are worn in part by ITW. That's all losses. Is that a cost of doing business, or is that a loss? Justice, that's the point that I'm making to you, is they want to get bogged down. I'm on summary judgment stage now, and they want you to say as a matter of law, a cost is not a loss. And I suggest to you that's ridiculous, and that's not what the case law says. Well, one case, Colburn out of Eastern District, Texas, says, but sharing costs and sharing losses are not synonymous. Justice, I like what you, but I like what, I'm sticking to you. I'm sticking to Second District. Where is that in the lottery ticket case? That's your case. The lottery ticket case is your case. Where is the lottery ticket case? But that's a cost. But what is the cost? Exactly. You just said it. The cost is the loss. Whatever that fellow paid that was trying to finagle out of these ladies they should have paid, right? He bought the ticket for five bucks or whatever the cost of the ticket was. That's what this court in the Second, I don't care what they say in Texas. I'm going by what you guys tell me to do. Would you agree, though, that that case is so simplistic that the cost is the loss and the loss is the cost, and that is synonymous because the only cost is the loss. If you pay ten bucks for a lottery ticket and you don't win, you've lost the money. That was your cost. That was your loss. Now, this is, as you said, a very complex business relationship where there are costs and not necessarily losses. Well, I'm saying there are losses, but let me argue that to a jury. And, by the way, this Abdul case, which they don't want to talk about too much, it says, accordingly, we do not find that a provision for sharing of losses was essential to the existence of a joint venture. So they're backing away. They're backing away from this whole thing. You've got to have every one of these little pieces. They're saying, look, we've been examining the record in Abdul. There's no discussion. There's no evidence of a sharing of losses. There's no evidence of losses at all, but we're still going to say there's a joint venture. And I'm saying to you, if they want to get bogged down in these semantics and cite to you all these New York and Texas cases, I'm just going right to the heart of the matter, right? If you look at these Illinois cases, you even look at Capra Sky, believe me, I'm familiar with Capra Sky. If you even look at Capra Sky, there's expenditures there that are losses, right? I mean, any of these cases, we're ultimately talking about putting – and then the one that I cited, which I liked, which is the energy case. Remember the energy case where people got – two parties got together to do these batteries? It's – Yes, it's pros. Yeah, I'm sorry. Pros versus mid-America computer? No, no, Justice. You know, now I'm dropping the ball here. I'll come up with it when I get it. Let me ask. Any of these out-of-state cases have facts similar to these in a business relationship, buy-sell relationship? I didn't find any in the cases I read, nor in the Illinois cases. I didn't see them. United – I'm sorry. Go ahead. It's United Nuclear Corporation. And just to finish the thought, the loss there, Justice Burke, was – that Illinois case looked to what each of the parties put into it as a loss, and they included not only the financial investment, but they also specifically looked at time and effort of the parties. And here you have that on both sides, right? You've got ITW employees coming by and spending time on this plastic production, and you have Western plastic people as well. All I'm saying to you is that the courts look at the expenditure of costs and determine whether or not there's loss. And please, I beg of you, I'm here at a summary judgment. All I'm suggesting to you is I ought to be able to argue this to the jury, and I'm – it is not – I mean, one thing I know, one thing I know, and I don't know how to time this up, is the case law is very clear. We are not confined by the four corners of this agreement. And even if we are, I would say it's subject to multiple interpretations under your decision and mine, which I embrace. Thank you so much for your time. Let me ask you one question. Oh, I'm sorry, Justice. I mean, this agreement called for ITW to pay for the pellets. I think it was 1090, which is great for me. I think there's a – if I'm not mistaken, there's a division of costs. 10% to one and 90% to the other. 90% to ITW, which I love. Which I love. It's a sharing of losses, Justice. So that's – they're to pay for that. Or they didn't pay for the whole thing. So who was contracting for the pellets? Who was signing the contract with the pellet producers? I don't know. I don't think that's – I took every – I don't think that's in the record. I think what is in the record is there was a joint payment for the cost of the pellets. Who actually the check was written to, I don't know. But, you know, then – ITW paid overtime for the Western employees. And ITW then also, you know, paid for these rollers. I mean, what other – that's what I'm saying is the 800-pound gorilla in the room is they want you to say this is – this is sales, but, you know, vendor business, and that's what we've got to stick to. What other – I mean, where do you park your employees and tell the other people what to do? Where do you put thousands of – I saw the equipment. It's like as big as this thing. And it's parked there on the machine of Western Plastics. And there's a wall and a wire that goes through the wall, and they're real-time monitoring it. I mean, where does that happen with every arrangement? Do you think McDonald's has got somebody parked there with monitoring equipment when they make the Styrofoam cups that they buy the – no. They buy the Styrofoam cups. That's the relationship that that case law is talking about. So are you saying this is a unique relationship? And that's – and not only am I saying it, Justice, but every single ITW employee. They wiggled around, but they ultimately said it was unique and like none other. Don't take my word for it. That's what the record says. That's what I'm relying upon. It's shocking. It's – I mean, what other case do you have where you have a – when I'm buying a product, right, I'm buying a product, and then I'm going to go and pay for these very – that's the rollers, these very expensive rollers. That's the rollers that Mr. Hyatt's arms got amputated on. It's their rollers. I mean, it's shocking that we're having this discussion about whether or not there's any fact, including all inferences, that led to whether it was a joint venture. I ought to be able to argue this to the jury. That's all I'm suggesting. That's all I'm asking. I should be able to argue this to a jury. Thank you so much. Thank you, Counsel. Ms. DeGran, you may proceed. Good morning, Your Honors. Keira DeGran for the Appellee, the defendant, Illinois Tool Works. May it please the Court, Counsel. I'll begin where I think that the Court began today and also I think where the case law directs us to begin, which is looking at the intent of Western Plastics and ITW when they wrote this contract. Is the intent governed by the four corners, or is Counsel argues that we must look beyond the four corners of the agreement? I think it does not, the law doesn't require the Court only to consider the contract in every circumstance. But what the case law doesn't say, and what contradicts really the basis for the plaintiff's argument, I'll submit to the Court, is that a clear expression of what the party's intent is that is declared in a contract can be ignored. And that's what can't happen. So what happens in this case is, and it is very much like the public electric case, is that there's a provision that specifically says we are not the agent of each other. This is paragraph 18, the independent contractor position. Neither party has the right to bind. Neither ITW can bind Western Plastics, neither Western Plastics can bind ITW. Well, do you think that's dispositive? Is that the provision that breaks this argument? I don't think that the- Or is it, are there other provisions in this contract that might make the contract ambiguous? Because of the cost sharing in paragraph 15, because of the automatic renewal in paragraph 13C, because of the yearly blanket purchase orders from ITW in paragraph 3, and because it's unlike public electric, which explicitly rejected the existence of a joint venture in the language of that contract. My answer to your question, Your Honor, is that other portions of the contract actually also support the notion and only support the notion that these parties did not intend to create a joint venture. And I don't believe that there's any provision of the contract that does support that notion. In addition to the independent contractor provision, which has the denial that there's an agency relationship, denial that either party can bind the other one, that expressly says I'm a buyer and you're a seller, then there's also the provision in paragraph 7 that says, okay, here's how we're going to deal with liabilities. This is not a shared liability situation. Western Plastics is going to be responsible for liabilities that could arise from any kind of defects in the product or failure to meet the specifications. ITW is responsible- Well, that's on the manufacturing end. Right, that's on the manufacturing end. ITW is responsible for any design problems. This is the opposite of a sharing. This is my part. This is your part. But there were two separate businesses, right? That's correct. I mean, they couldn't-ITW couldn't do what Western did. Well, whether it could or couldn't, this was the contractual arrangement that they came to. The other aspect of the contract that I think very clearly declares the intent of the parties, and this Court has said the intent of the parties is the most important aspect in determining whether there's a joint venture relationship. A creature of contract doesn't arise by operation of law. So there has to be an agreement. There has to be a meeting of the minds. There's also paragraph 8, and I believe beyond, that specifically says the intellectual property, this is not a shared thing. This only belongs to ITW. And there's another aspect of the contract that I believe says loud and clear and unambiguously, this is not a joint venture. And to the extent that Public Electric specifically said we're not a joint venture, I think, and I think Public Electric does control this case and is directly on point. But in addition, I think our language perhaps is even better because it doesn't just reach the legal conclusion it's not a joint venture. I think in that case they call themselves subcontractor and sub-subcontractor. In our case, it doesn't just talk the talk, but it walks the walk. It doesn't say we're not a joint venture. It says we are not going to share liabilities. We are not going to be able to have the authority to make you responsible for what I do. So it gets down, it gets into the heart of what is a joint venture, which is essentially a partnership. And partners are agents of each other, and they can bind each other, and that's exactly the opposite of what's provided for in this contract. Was ITW compelled by the contract to pay for the replacement of those rollers? I don't believe that it was compelled by the contract. Why did it do it? The purpose of contributing toward the roller generator was to improve quality of the product. Efficiency or quality? Quality, I believe. Both, perhaps. But quality is what I know was identified in the deposition testimony. Are you saying all these unusual components of this working agreement, are those all due to the quality control issue? I guess I would want to know specifically what the court was asking about as far as anybody. The additional instrument, monitoring instrument and so forth, is that strictly quality? Definitely a quality control issue. Because that wasn't provided for in the contract either, right? That was not provided for in the contract. That's a matter of we want to make sure, and I think that the deposition testimony of Mr. Lazon gives a good explanation of why it made sense for ITW and also Western Plastics to have that monitoring capability. But that did not establish, and I think counsel said a couple of times, and I think this is incorrect and not borne out by the record, by any aspect of the record, that our ITW people were telling the Western Plastics people what to do, that they're coming in and they're getting orders. Well, Peterson went over there several times a day to give them change orders and tell them what to do. Excuse me, Your Honor, I'm sorry. Go ahead. Yes, but the what to do has a very important caveat, and that important caveat is as it pertained to meeting product specifications. So he's not over there. And this was an interesting point that came up at the very lengthy oral argument before the trial judge on the motion. The trial judge must have asked six times, tell me how ITW controlled or what input they had into the cleaning process. Tell me what not. So we're not just talking about looking at issues of quality control. We're talking about issues, the broader issue of management or cleaning. And she tried to get that and what the ultimate answer had to be really none because there isn't any evidence of that, not any evidence whatsoever. There's nobody at ITW, including, you know, Mr. Peterson, who is a commissioned salesman for Western Products and also had a role for ITW. But that role that he had was not telling these folks how to run these machines and when to clean them and how to clean them or any of that. All right, if we can leave cleaning the machines for just a moment. Sure. And I'd like to go back to focus for just a second on the cost improvement provision in the contract. Sure. Don't you think that the parties' agreement to share equally the benefits of these cost improvements really suggests that they intended for their profits and losses to rise or fall together? In other words, by sharing the benefits of these cost improvements, weren't the parties preventing one from increasing the profits at the expense of the other? I don't believe that's correct, Your Honor. How do you not get that from the language that is used in the contract? Because there may be a mutual economic benefit if costs are kept down. Right. But that's not the same thing as sharing profits. I mean, the concept of sharing – Why not? Okay. And here's my explanation for that. The concept of sharing profits looks to – Is my stake in this going to rise or fall on what happens in terms of sales of the ITW ultimate product? So we know, when we look at the source of the revenue, the source of the revenue and the ultimate profit of Western Plastics is I'm going to make these – I'm going to fill your orders, and I'm going to charge you for them, and either you're going to pay up front or you're going to pay at the end of the day in pursuant to invoice for these extra things that have to be built in to make the product, to keep the product up to specifications. And if ITW, if something happens and the floor drops out and your business goes under, you still owe me. And that's – so the money, so the source of the money that goes into the coffers of Western Plastics is completely different than the source of the money that goes into the coffers of ITW, which is through the sale of the product. And there's another just sort of point that I think is relevant and maybe wasn't made clear during the questioning with Mr. Bruce was, yes, Western Plastics of record shows does have other customers. ITW is not its only customer. They had a couple, but I mean the manufacturing agreement here provided the formula for calculating the price at which Western sold these finished products to ITW. So Western really wasn't free to increase the prices in order to make a greater profit. Well, but they – I'm just saying that as far as their business was concerned, they weren't selling this specific product somewhere. They couldn't sell it to anybody else because it was a proprietary formula. Right, a proprietary formula owned solely by ITW, another aspect that shows there's no sharing. But yes, but they did have other customers. So there was – this was not – ITW wasn't their only customer. Right, but in manufacturing this particular plastic, these two companies were tied together. As far as this particular plastic, then yes, ITW was the sole purchaser. And to say, well, this isn't a unique agreement, I think that you probably could say that about a lot of agreements. But this is the specific agreement that was put in place, that was negotiated at arm's length by these parties. And at the end of the day, when you look at the contract, I don't believe there's anything in that contract that suggests that Western Plastics was entitled to make any kind of claim to ITW's profits. It just wasn't. Do profits have to be pooled in a joint venture? Is there any Illinois case that says that? Yes, Your Honor. This court said that in the pros case that there had to be a sharing of both profits and losses. But not that profits had to be pooled. Well, I don't believe that they used that specific terminology. But there has to be a sharing of profits and losses, both. And so to the extent that there was any language in the Amble case that said, well, we're not going to necessarily look at whether there's a sharing of losses. These two parties, this was the case where the one party contributed the effort to developing the property and the other party put down the money to purchase it. The contract that they had in that instance only went to a limited extent, and the court said, well, we don't think that they were contemplating losses. But that's an old First District case. The First District has since, in the Koporowski case, said, got to have both profits and losses, and that's what the law says in this district. So I don't find that to be a terribly significant aspect of that decision. You know, I didn't ask Mr. Bruce this, but I have a chance on rebuttal argument to address it. The trial court, sua spate, brought up this issue of workman's comp. Correct. And whether that would be the sole, should there be a joint venture, whether that would be the sole remedy. What's your position on that? I think that's a valid position, and I think that's a valid defense in this case, and it's a valid alternative basis for affirming the trial court's judgment in favor of the defendant. You didn't raise that in your pleadings. We did not raise it in our pleadings. We raised it in our brief in this court. It's an affirmative defense, though. It did have to be raised below, though. Isn't that correct? It wasn't pleaded. It was raised purely by the court. That's correct, Your Honor. But there's no prohibition against this court considering an alternative basis for affirming the judgment on that basis. And I'm not going to pronounce it right. The Eiger case, I-O-E-G-E-R, and the Smith case, they make 100% clear that if there is a joint venture, and then the participants of the joint venture, if one has immunity, the other has immunity. And it's not necessary, it's not required that all parties to the joint venture necessarily had contributed to the workers' comp premiums. Well, but again, if it wasn't raised below by you, then the trial court shouldn't have raised it sui sponte. Well, the court raised it, and our position is that it's a valid alternative basis for the court to consider. Your Honor, Justice Zinoff, you raised the question, are there any other supplier cases that were cited in our briefs on buy-sell, as far as on the issue of whether there was a joint venture? And we did cite the Quadro case and the Shenton case, and Quadro is a Northern District case, that I believe that was the one with the Avery labels that were sold, and then the Quadro case also, I'm sorry, the Shenton case also was that kind of a factual situation. I don't believe that there were decisions of this court or of the Illinois courts. Thank you. Any further? Thank you very much, Your Honors. We'd ask that the court affirm the judgment in favor of Illinois Tool Works Act. Thank you, Mr. Graham. Mr. Bruce, rebuttal argument? Thank you, Justice. And it seems like you're fighting hard to make this a joint venture, and now, if it is a joint venture, why doesn't Smith apply and knock you out of the box? Yeah, so I've been doing this 21 years. I've never had an experience like that I had in this trial court in this circumstance. And, Justice, you hit the nail on the head, and I'm not being facetious. I have utmost respect for Mrs. DeGran's firm, and we had a lot of cases with them. They are a very good firm, okay? We have litigated this case for years, 50 depositions, 40-some depositions, okay? This is a serious case. My client lost both of his arms. I'm alleging that they owed my client a duty. We had these huge oversized briefs, principal brief, response brief, reply brief. Then we have over two hours of argument. Nowhere, nowhere was this ever suggested, raised, argued, mentioned, anything by any party. I sit down. Well, wait, wait. I thought the reason the trial court, maybe it was in the front of the trial court's mind, was because that was the basis of a Western Plastics motion to dismiss. Western Plastics had nothing to do with it. We were there just on the ITW motion. I know, but I read the transcript from this date, and there was some discussion before you got into your argument about the Western Plastics motion. We never briefed the Western Plastics motion, Judge. We never got to that. I settled with them, and they're dismissed. Wasn't there a motion? They filed a motion, and it sat there. They never pursued it. They never briefed it. I never briefed it. The judge never asked me to brief it. I know, but the trial court knew it was there, and the trial court mentioned it at the beginning of the argument on this case. That's all I'm saying is that the issue was— It wasn't there, Justice. It wasn't briefed, I understand you, but it wasn't there. I mean, respectfully, it was not there. That was not—no other parties, no other lawyers were in the room. We never got a briefing schedule on that motion. They filed some, you know, before-line motion that they filed in the inception of the case, and it sat there. When the trial judge said this, I mean, you were taken by surprise. I understand what you're saying. But I hadn't finished my argument. I know. You were going through the whole thing, but they didn't raise it. But then I sat down, Justice. Then I sat down, and then she read this opinion. I know. That's what I'm getting at. And so I didn't have a chance to— Did you file a motion to reconsider? No. No, she was adamant. She wasn't going to do anything. Okay, you didn't file a motion to reconsider. Now, in this court, when you filed your motion of appeal and you filed your initial brief, you basically addressed that issue, as you should have, or as raised by the trial court, and said why it wasn't appropriate. I had to address it. But you didn't argue in this court that that was inappropriate for the trial court to do it, that it was prejudicial, and now it's been fully argued and briefed before this court. I mean, I don't know how you want me to respond to that. She said it in the thing. I can't just sit there and let it sit there. I think it's a red herring. And the point that I was going to make is the reason why I was going through the whole thing, and there are an excellent term. I would suggest to you the reason why they didn't raise it is it's a complete, meritless, ridiculous argument. And I mean that very sincerely. Justice Carmeier was absolutely 100 percent correct. This whole issue of IOKR had one issue, right? There's some construction workers on a bridge, right? There's four guys on a bridge. They fell. They were injured. And he sues the other entity, the co-venturer, not his employer. He sues the co-venturer. That's the fact pattern before the court. And then, ironically, there was this whole kind of factual discrepancy between the appellate court opinion and the Supreme Court opinion about whether or not they did pay or they, in the joint venture, did contribute to workers' compensation benefit payments or not, right? And the Supreme Court said, no, you guys had it wrong. They did contribute or had the right to contribute. And, therefore, they did contribute. And, therefore, the work count bar applies. But I don't think, I mean, being plaintiff-oriented, I don't think I could have written, if I was clerking for the Supreme Court and Justice Carmeier at the time, a better quote than what he wrote, which is now escaping me at the moment. But he was very clear when Justice Carmeier said, you can't have your cake and eat it. And that's fundamentally fair. So now I'm getting sandbagged by both sides. I mean, you know what I'm saying? I mean, I get the trial judge raising this for the first time. I never heard this before. They didn't raise it because they knew it was a meritless argument. That's going nowhere. Well, did they have to raise it as an affirmative defense? They didn't. They didn't do that. And I think I pointed out, I hope I pointed out in this brief, that this was, like, sprung on me by the time I sat down for the first time. But I didn't. She wasn't going to change her mind. Justice, I'd rather be here talking to you. I understand that. And I know why you raised it in the brief, and it makes sense. I understand all that. And the only thing you put in your brief was that the court raised it sua sponte. You didn't argue in your brief that it was an affirmative defense that should have been raised. You didn't argue in your brief that in some way you're prejudiced by it in this court. And now the issue is before this court. You raised it because the trial court did. But you raised it in your brief, and you fully briefed it. You fully argued. Both sides have argued it. Is that issue now before us? Well, I would suggest it's not before you, Justice. Even though you argued it. I didn't say it wasn't before us. What am I, as a litigant, supposed to do? This man lost his arms. She raised it as a basis for dismissing the case, I think, erroneously. I don't think they raised it because they know it's a meritless argument. The Supreme Court case is directly on point. I got to do something. I hear what you're saying, Devin. Is it before us now? I would suggest to you it's before you in the sense that she raised it. I would address, if I was clerking for you, what I would be doing is saying, Justice Berg, I think the first issue is to decide whether or not we need to address this because they didn't plead it in their answer and motion to dismiss. It's not been raised by them. I think we need to address that first before we raise the item. That's what I would be counseling you back there. Maybe your clerk is in the back. I don't know. And if I was your clerk, I would have written in the brief that, you know, this is forfeited. They didn't raise it, so it's forfeited, and the trial court was improper for raising it to respond to it and were prejudiced by it. I would have written that in the brief if I was your clerk. I know, but, Justice, you guys do this all the time. You can say it's a waiver, and you guys do it all the time. Well, boy, I wish I could make a couple real quick comments because you got me kind of sidetracked on the word compensation. I won't talk about that anymore. She just scored a couple points real quick. I'll give you, like, a minute or so. Oh, gosh. All right. Look, on the issue that Justice Spence raised, I mean, Justice, you were asking a couple poignant questions, but I think there's an important point here. You were pointing out to counsel that many of the aspects of the evidence that I'm pointing to about the nature of this relationship is not within the four corners of this agreement. Evidence that they cannot refute, like the monitoring equipment, like the sharing of costs, like the overtime, that's not here. And I go back to your Maher decision, which you reversed summary judgment on the trial court because all of the conduct of the actors wasn't reduced. Whether the terms of the written contract are modified by acts or conduct of the parties is a question of fact for the jury. That's what you guys have told us. Question of fact. That's Maher 267. He'll have 369-1994. And they also talked about different inferences. Counsel spent a lot of time. Look, real quickly on this provision. They didn't write in there, this is not a joint venture. They didn't write in there, this is not a partnership. They didn't make some vague reference to agency. But then, now wait, because I know where you're going. Well, Devin, it's pretty obvious. No, Justice, I know where you're going. Let me address this. I'm just going to look at my face. But look at paragraph 8. I love paragraph 8. They don't want to talk about paragraph 8. If you're taking notes, look at paragraph 8 when you go back there. Paragraph 8 gives them, meaning ITW, under this written agreement, I mean, they can't have it always. You can't pick and choose. So, okay, they want to say the independent contract. Okay. And they say, well, nowhere in the contract does it say anything in the contract. Well, I don't know. Last time I went to Hornbook Law, right to control manner and method of work is agency. That would contradict the last paragraph. So look at 8, and what does it say? ITW may from time to time, and it goes on, provide Western with certain changes for use in the manufacture or processing of products. So now they're saying we reserve the right, we ITW, to change the way you guys manufacture products. Now, that goes to the heart of it. I mean, this goes to the heart of the matter. And you say, well, why is that relevant? They want to say, just look at this independent contractor. I go back to MAHER. Because now, and your SURE case, S-H-O-R-R, SURE versus paper products. Again, second district case. Court should not, should give effect to all of the provisions. Don't focus on just one provision. So now I want you to look at that provision. And you say, well, what's the significance? I'm saying that's agency. That contradicts their independent contractor one. And where is all this going to get ferreted out? It should get ferreted out in front of a jury, not in front of where we're at now. I mean, I respect that. I'm saying, no, no, that didn't sound right. And then also, you know, they want to talk about that public electric case. How did that talk about joint venture? But keep in mind, we've got 14 years here. And there's no, you know, keep in mind this has got a three-year life. Did you guys know that? There's a three-year life to this contract. And it was written and signed in March of 1993. My client was injured 14 years later. The price sheet to this, the price sheet to this is for 1993. The only point that I'm making is on its face, they have to acknowledge that this has changed over time. You can't just look at this and say, well, they used the same price sheet from 1993. No, they didn't. It changed. I'm sorry. I took too much of your time. Thank you so much. Thank you. Thank you. Thank you. Thank you.